May it please the Court, my name is Sean Blackburn and I represent the appellate in this case, Iridescent Networks. The appellate asked the Court to reverse the claim construction of the District Court for the Eastern District of Texas. This bill involves only one term, one issue, and that's whether the District Court erred in importing from statements made solely in the prosecution history of strict numerical limitations upon this term. The appellee's arguments in support of the District Court's opinion are based on two incorrect premises. First, they claim that the term quality of service, that there was an agreement amongst the parties that this had a certain meaning. They're wrong. There's never an agreement. And two, what they say the meaning is is completely unsupported by either the intrinsic or extrinsic. What's your meaning? Well, so for quality of service, which is different than a high quality of service connection, quality of service simply means five dictionary definitions. This was not the construed term. Quality of service simply means the parameters or the performance of a network based on certain parameters. So what does high quality mean? So high quality means... You coined that term, correct? I'm not sure that that's true, but there's not evidence in the record of other uses of the term high quality of service connection. I don't think it matters that it's a coined term. We briefed that in our brief. You still refer to the specification to determine what it means. High quality of service connection simply means that you are assured what you need, right? In the sense that... I took it that that was in fact your position, that high means guaranteed, even if what you're guaranteeing is junk. That seems very surprising. I don't think it means even what you're guaranteeing is junk, because I think what it is is if what you need is a lower bandwidth or less packet loss, to you that connection is high quality because the results of that connection gives you what you need. Speaking of a video, like if you take some of the examples in the pattern... Right, but if there's a carrier or a service provider who's offering objectively good quality and objectively bad quality, but charging a really quite different price for them, you may ask for the objectively bad quality because it's costing you only a dollar a month or something. And it's kind of surprising to me, and in particular I don't see in the prosecution history, when you said to the examiner, here's kind of what we mean by or here's an example, there was nothing in there at all I think about assured or guaranteed, but rather it was all about the objective characteristics of the transmission that was going to occur. And I think that's, and the district court criticized us for that as well. There were kind of two issues there, I'd like to take them in turn. The whole point about like you could get a lower connection speed for a cheaper price, that's not what this is about. This is about what the application needs, not the user. In order for these applications to work functionally, they have certain quality of service parameters. What makes it a high quality connection is that it will give that application what it needs to work. And in figure three, it lists a whole series of different applications. But that's only if you want to achieve a certain result, right? If you want to achieve a certain loss of packet or latency type results, then you would call for more bandwidth. Well, those are actually two technically different, those are, you can need bandwidth, there's packet loss, and there's delay. They're not, okay. They're somewhat related, but they are distinct concepts. But you understand my point. I understand, but it's not that you would call for it. It's that these applications have requirements for quality of service in order for them to function properly. They may function on a best effort connection, the old internet, but they wouldn't function as well. So that's to your first point, Judge Toronto. To your second point was, I think context matters quite a bit for this enablement rejection. And one of the things, the other point in which I think that was not drawn out very well in the briefs is that the prosecution history, it was not about determining what is high quality and low latency. That's not the rejection to which this statement was made. I think I got the case right. Forgive me if I don't. Your point is that this was not in response to an indefiniteness rejection, but in response to an enablement. I'm actually making, that is true, but I'm actually making a slightly different point. There were multiple enablement rejections. So in the briefs and below, AT&T had said that, and they say this is how they state their issue, is that, in fact, let me get this right without saying it incorrectly. They say that this statement was made in response to the examiner's rejection, stating the specification failed to explain how high quality was determined. That's not accurate. The patent was filed in 2007. It contained very different claims. I guess my point is, I think, or my concern is sort of independent of whether this was being offered as definitional or being offered as an example. The thing that I guess I'm focused on is that this is being offered to tell the examiner something or other about this quality of service, and there's not a word in there about guarantee or assured. It's all about objective characteristics of the connection, which seems to me to make it hard to say that this high quality of service term is equated, which I take is your view, to whatever is assured. But that is, the specification does speak to the terms. Backing up to the enablement rejection, so the district court, and I think it's quoted in their briefs and possibly in the district court as opposed to the magistrate's opinion, said, well, why didn't you say that it was assured end-to-end? Imagine if the examiner had rejected this claim term and they came back and said, well, on enablement grounds, and it's not adequately described in the specification, you say, well, what this means is one that is assured and managed end-to-end. And he would say, OK, now how is that enabled? The answer to the enablement question was to show that there are a bunch of connections, a bunch of applications that have certain requirements that one of ordinary skill in the art would be able to make and use the invention, make and use basically not just the connection but the entire claim, which is this distributed approach to dynamically directing packets across the network, dynamically provisioning a path for them, showing that it was enabled based on very specific examples in the specification. The specification calls them samples. If you turn in the specification itself, it does talk about these things being managed end-to-end. The specification, if you look in the first couple of columns, there are only two types of connections described. It's in page 47 of the appendix. It's the first two columns of the appendix, and it actually bleeds over on 48. It's the background of the invention. In the background of the invention, it talks about best effort connections. These best effort connections, they didn't manage resources end-to-end. What happened is a router, there would be a series of routers in the network, and each individual router would make a series of decisions about how, on an ad hoc basis, to send a packet forward. That would result in packet loss, delay, and at the end of the day, for certain applications, they wouldn't work well. You get glitches in your video calling. That is in contrast with prior art high-quality-of-service connections, which are the MPLS standard. The MPLS standard, what it is described as having is it has quality assurance of this, the IP multimedia subsystem and the MPLS routing architecture. This is coding down at 254 and 255. Quality assurance requires managing services end-to-end from customer access point to access point. The point there is that what had happened in these MPLS systems is they're basically VPN networks. They were prededicated lines. You could control how the packets were sent from one side to the other, whereas in a best effort connection, it's just bouncing around router to router until it gets there or doesn't. What separates our high-quality-of-service connection from MPLS is that it's not a static line. Another term that was construed, that's found deeper in the claim, points out that the inventive quality-of-service connection is one that is dynamically provisioned. The specification only refers to these two types of things, one in which they bounce all around and one in which they are managed from end-to-end. They assure that you will have what you need. I think one of the other issues is that the district court looked too high in the abstract, but it doesn't refer to just high. It's a high-quality-of-service connection. What does high-quality mean? High-quality doesn't mean high quantity. It doesn't mean a high amount of bandwidth. In fact, in multiple places in the specification, it refers to high-quality bandwidth. The point there is that high-quality is a qualitative term. If I say that your Honor has a high-quality car, that doesn't mean that it has 450 horsepower. Just give me an intuitive idea of what high-quality bandwidth could mean. Different from a number. That you have what you need. What we call is defined, it refers back to the application. If you have an application that needs 64 kilobits per second, having 1,000 doesn't help you. But if you have one that needs 1,000, then having 64 doesn't help you. But by assuring what you need, it's quality because the video will look good at the end of the day, and that's why it's a high-quality-of-service connection. I notice I'm into my rebuttal. Yeah, let him hear from the other side. Good morning. Good morning. Thank you, Your Honor. Michael Hawes, representing the Ateliers AT&T Mobility, and Eric. I'd like to start with the question that you asked Judge Toronto when you asked, how can you have a level of service that is really, really low? Yes, it may be guaranteed, but it's guaranteed at a really, really low level. And that that is necessarily a high-quality-of-service, which it is under the claim construction proposed by the plaintiff. And what I would urge is that we look at the actual figure. It didn't get much discussion by the plaintiff, which is figure 3 on appendix page 38. Turn there with me, Your Honor. And I would emphasize in figure 3. And this is the only reference to high-quality-of-service in this specific case. Did the district court make a finding that this was a term coined by your opponent? The district court made the finding. The semantics of coined, I don't know, Your Honor, but the district court made the finding that in the extrinsic evidence, there isn't a meaning to high-quality-of-service that the person of ordinary skill would bring to this analysis. So does figure 3 go to answer what high-quality is? That's correct. They would have to go to the intrinsic evidence as a whole, which includes both figure 3 and the description of figure 3 in the prosecution history. That's the evidence we have for determining what this term, which remember the applicant added this term during prosecution, not in the original claims. So the applicant adds this new term during prosecution, says look to figure 3, which has some applications included, but others excluded from the box. And now the plaintiff wants to say, this term covers systems that don't provide any of the included applications, but would only support the excluded applications. That's how broad they want it to be. Following up on your question, Judge Toronto, for example, that OHO video call, which is the second from the bottom in figure 3, that has certain requirements. If you look, it has a certain amount. It's low, but it has a certain amount of needed bandwidth. And then it has specific requirements as to packet loss and latency. And yet the applicant did not include the OHO video call as a high-quality-of-service application. So we know that the plaintiff's construction can't be right, because the plaintiff's construction wants to encompass a system that includes the very thing that the applicant chose not to include in its box, that it chose to exclude from its box, in the only reference in the specification to high-quality-of-service. And that's also important when you listen to what my colleague said at the end of his presentation. Remember when he said the amount of bandwidth is not the critical feature? Well, let's look at this figure 3. Specifically, let's look at video conferencing that is right there at the bottom of the box. And let's look at the OHO video call, which is outside the box. If you'll look to the right to the two columns of packet loss and latency, you'll see those are identical for those two applications. In fact, the only difference between those two applications is in the bandwidth needed. That's the required bandwidth. It says at the bottom, bandwidth megabits per second needed. That's a requirement. So the only difference, the only thing that makes one application high-quality-of-service and another application not high-quality-of-service is a difference of bandwidth. The specification only teaches the opposite of what we just heard, which is that bandwidth is critical to understanding what is high-quality-of-service and what is not. You're not saying that bandwidth alone is the only difference, because that's not what the District Court found. And you'll see there are three different quality-of-service requirements, measures that are included here. All I'm pointing out is that for those two applications, the other two are exactly the same. So between video conferencing and OHO video call, the only difference was bandwidth. But you'll note, Your Honor, there are other applications where it's the other requirements that are important, not just bandwidth. What happened here was that the specification outlines some things are high-quality-of-service. Some things have quality-of-service requirements, but are not high-quality-of-service. And then the applicant relies on that distinction when they add new claim language saying high-quality-of-service connection. And they explain, here's what it means. Approximately 1 to 300 megabits per second. And the packet loss and latency, depending upon the application, which is what you see here. All the District Court did was take them at their word and say, that's what you've said high-quality-of-service is. That's the only intrinsic evidence telling us what it means. You've introduced this term with no extrinsic evidence, where a person already skilled in the art wouldn't know what it meant. We've got to go with what you've disclosed in the way you describe it. The construction here is not absolute. In their briefing, they make it sound like the judge gave them an exact cutoff, and the judge didn't. The judge said approximately 1 megabit per second, because that's what they had said in the prosecution history. When they describe that bottom borderline that borders and thus separates high-quality-of-service from normal quality-of-service. Does the specification explicitly say that Figure 3 is just an example? Your Honor, it says that Figure 3 includes examples. That's important, because it has examples both of high-quality-of-service and examples that are not high-quality-of-service. In the prosecution history, when they came back and said, we want to use that distinction as part of our claims, they were, in fact, taking into account that there are some that are included and some that are not included. They described where that borderline was when they said approximately 1 megabit per second. They didn't describe it absolutely. They didn't say, well, 1 megabit per second, if you're over that, you're good. If you're under that, you're not. They said approximately, and Judge Love and Judge Schrader included that in the construction. Approximately 1 megabit per second. But plaintiff has stipulated that they cannot show infringement under approximately 1 megabit per second. And what that tells us is that they're trying to capture something that is well south of that dividing line that they included in Figure 3, and that they described in their prosecution history as being a key part of the claim construction. They shouldn't be allowed, as Judge Schrader said, to tell the Patent Office, we've added a term. Here's what it means, approximately 1 to 300 megabits per second. But now we're going to come into district court and say, this system that doesn't support anything in that box, and would only support things that are outside the box, is infringing. Can I ask you a question that I guess I mean to be more of a legal question? Of course. Here's the premise or the premises of the question just for purposes of this question. Suppose I thought that the claim construction offered by the other side is wrong, that assured can't be the meaning of high. Suppose I also thought that the level of numerical specificity here, it seems dubious or something by assumption to import that into a term like this, high quality of service without something more definitional, or something that says these are the industry standards or something. So here I would be saying by assumption that the district court may be, that seems like a construction that's a little off, and the only construction that's being offered in contrast to that is also wrong. What obligation or discretion do we have to find some third construction? Your Honor, under this court's law, this court has noted that when it is the applicant who introduces new language that doesn't have any basis in the understanding of those of ordinary skill, and here they admit that there's no extrinsic evidence indicating that those of skill would have understood what they introduced, that you don't construe that against the public. You don't say, well, we're going to broaden that beyond what they taught. The only thing they taught, as they themselves admitted in prosecution, was that these high quality of service applications would have an assured bandwidth of at least approximately, and Your Honor, again, it's not an exact cutoff, approximately one megabit per second. So under this court's law, when you come in as an applicant, you introduce a new term that has no meaning, you don't get scope beyond what you gave in the specification. But you're answering the substantive question, the substantive legal question, but I understood Judge Taranto to be just questioning whether or not we have the authority to come up with a third answer on claim construction. I think the answer to that is yes, we do have the authority, or at least the discretion, if we chose to come up with a third. So my answer to Judge Taranto's question is that. Am I wrong? First, I'd note that this court does find waiver in claim construction positions. So where the two parties are addressing the particular parameter, and they have not raised the middle position that you're looking for, Your Honor, I think. That is waived. They have to state their positions to the district court. We certainly have cases, I can't cite them, but I think I'm going to rely on my memory, where we have said we are not bound by the choices presented to us on claim construction, and we can adopt our own. The question is whether we're obliged to do that, or can we say the challenger, the appellant, has presented us only one alternative construction, alternative to the district court one. We think that's wrong. We can, if we choose, stop and simply say we will therefore affirm. I definitely think it's discretionary at minimum, Your Honor. So for example, ExxonMobil was always the first big case here where the court did look and find an independent, a different construction than that which was proposed by either of the parties. In that situation, there was information in the record going to the construction chosen by this court. Here, there's nothing in the record going to a construction between what they're proposing and what was decided by the district court. And I think in this situation, this court certainly has the discretion to say the challenge raised does not show error by the district court because there isn't an alternative construction that is more proper than the one the district court brought. I don't disagree with you, Your Honor, that this court has the power and has, in certain cases, I don't remember the exact names other than Exxon, Lubrizol, Judge Toronto, but this court has adopted its own constructions. But none of those cases say that this court is obligated to search for a more correct construction when the construction of the district court is a better construction than the construction that is offered in challenge to the district court construction. Another question, which is, we've had a lot of cases this week, so if I'm recalling correctly, though, Judge Love, the magistrate judge, viewed this prosecution history in the context of a challenge to indefiniteness. Your Honor, that's true. And then Judge Schrader fixed it on appeal at the district court level. If I'm right about that happening, isn't that a little problematic or disconcerting? Because if I'm a judge and I'm looking at the first instance and I'm reading prosecution history as an indefiniteness challenge, my view of my whole analysis is going to be different than it would be if it was an enablement challenge, wouldn't it be? And so isn't that a little bit of a problem here? Your Honor, I think it depends on how the prosecution history labels the statements being made. And I'd point you actually to the prosecution history itself. So, for example, on appendix page 140, and this is the key prosecution history, Your Honor. This is where they discussed figure three and how it related to the termination. This appears a couple of times in the appendix, right? I'm sure it does, Your Honor. Obviously a key issue during, but 140 is an excerpt from the actual amendment in response. You'll notice that the title to the section in which they make the statement, and this is found on appendix page 140, is rejections under 112. There's no discussion by the applicant here that this is an indefiniteness rejection or an enablement rejection. It's just rejections under 112. And that's actually the same when you look at the interview that they had. And the interview is on page 427 of the record. The examiner also characterized this just as 112 rejections. So it's not like anyone— But you're not arguing that this rejection was anything other than enablement. I'm not, Your Honor. What I'm saying is that in the context of the statements made, neither the applicant nor the examiner felt that it was important that it was enablement versus indefiniteness. They referred to it as a 112 rejection. Do we have the— This says that the— Sorry. This is responding to the final office action. It is, Your Honor. So do we have the— You do have the final office action, Your Honor. And I'll just tell you, the final office action says enablement. It says enablement, right. Yeah, we're not— When they objected to Judge Love's—the magistrate judge's claim construction pointed out this issue, Judge Schrader looked at it and said, okay, you're right about that, but let me look and see if it would be different. And he concluded that it was not. Just to see if I'm looking at the right— Yes. That's at 368. I'll double check. Maybe other places as well, but that's the one that has nice yellow on my— Yes, Your Honor. And the key language is in paragraph 15 on page 369. You see, the specification does not adequately describe how high quality and low latency are determined. That's what the examiner was pushing. I'm out of time. Obviously, I'd be happy to answer any more questions, but panels— Thank you. Thank you. I'd like to correct one thing that just happened. This—page 369, this is not the rejection to which figure 3 was cited. I tried to get this—this was an earlier rejection. And to that rejection—and I'll give the appendix, so there's not much time for that. This rejection is at 368, 369. The response to this comes on 496, 499. And what happens there, because this is an important point, is how they are determined. In claim 10, which is one of the independent claims that had been rejected, the applicant put in a couple different determining steps showing how things were being determined. Bear in mind, this is a different patent application. It had very different claims because this was the parent. It was not until months later that the final office action came, which is found at appendix 271. And the response there is found at 351 through 357. It is actually a different rejection. It's not the one that says anything about being determined. What it says in the final rejection doesn't say anything about being determined. It simply says it's not adequately described in the specification. And if we go back, just to make one point on page 140, there was never any doubt that this was an enablement rejection. Literally at the very end, it says that high-quality service enabled bandwidth applications. It says that there is adequate description for it. This was not an indefinite rejection. It never was. There were indefinite rejections on other points. I'd like to quickly address Judge Toronto's question that Chief Judge Probst answered, which is to say, we have offered what we believe to be the correct construction. Below, AT&T offered what they thought was the correct construction. The district court actually made a hybrid. And in every Markman construction, Markman hearing I've ever done, the district court has at some point agreed with a little bit of this and a little bit of that and put their thing together. I would point out that even though we haven't offered maybe a lower numerical number or something that encompasses something lower, I will point out that this one megabit per second that was taken from an enablement rejection, that enablement response only refers to figure three. The specification also refers to certain speeds. So figure three deals with real-time video. And it says 10 megabits per second. But the specification points out that different real-time videos can require somewhere between 64 kilobits per second up to 300 megabits per second. So it is not the case. So if I were thinking about some alternative, I'm afraid I kind of freeze at that point. I'm not sure what it would be. Some alternative to what either the district court said or what you say, which is if it's assured, it's high. Well, it's high quality. It's high quality. I would like to point out that we don't point out that it's assured. It's high. It's high quality. One thing I can offer is that 64 kilobytes per second. We think our construction is correct. But 64 kilobytes per second, by adopting this thing from the prosecution history. Is it kilobits or kilobytes? Sorry. I don't know that there's a difference. KBS. Whatever. But by adopting the construction, it's set it at one MPS. It took out all the real-time video that was beneath that one MPS all the way down to 64 kilobits per second. That can't be correct based on an enablement rejection, which we're not attempting to define the meets and bounds of the claim. And this is, I can point to where that is in the specification. It would be, I believe, on page 47 of the appendix. I'm sorry. I think it's on. Actually, on 48 of the appendix. It's talking about different applications and what they need. It says, for example, right at line 37 of column 3. Additionally, the video compression methods vary greatly in bandwidth. They require to transport the video in real time. Some solutions are as low as 64 kilobits per second up to 300 megabits per second. So some of these solutions require 64 kilobits per second. And that would be, if you could assure that, that would be one that is a high-quality-of-service connection subject to any latency or packet loss requirements. That should fall within the scope of the claims, but the district court has concluded. I noticed the amount of time. Yes. Thank you. Thank you, Your Honors. We thank both sides, and the case is submitted.